IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:15-HC-2273-FL

| | | |
|---|---|---|
| ZACHARY LEE OAKS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| FRANK L. PERRY and | ) | |
| LARRY THOMPSON, | ) | |
| | ) | |
| Respondents. | ) | |

The matter comes before the court on respondent's motion for summary judgment (DE 17) pursuant to Federal Rule of Civil Procedure 56. The issues raised have been fully briefed and are ripe for adjudication. For the following reasons, the court grants respondent's motion.

**STATEMENT OF CASE**

On November 29, 2012, petitioner was convicted, following a jury trial in the Cumberland County Superior Court, of first-degree murder and assault with a deadly weapon inflicting serious injury. See North Carolina v. Oaks, No. COA13-701, 2014 WL 457769, at *2 (N.C. App. Feb. 4, 2014). The superior court sentenced petitioner to life imprisonment without parole for his first-degree murder conviction, and 25-39 months imprisonment for his assault with a deadly weapon inflicting serious injury conviction. Id. Attorney Bernard Condlin ("Condlin") represented petitioner at trial. (Resp't's Mem. Ex. 1, p. 1).

Petitioner subsequently appealed his conviction and sentence to the North Carolina Court of Appeals and was represented by attorney Sharon Smith ("Smith") on appeal. Oaks, 2014 WL

457769, at *1. Attorney Smith filed a brief pursuant to Anders v. California, 386 U.S. 738 (1967), on behalf of petitioner in the court of appeals. See Id. at *2. On February 4, 2014, the court of appeals held that there was no error in petitioner's conviction and sentence. Id. at *5.

On March 9, 2015, petitioner, through counsel North Carolina Prisoner Legal Services ("NCPLS"), filed a motion for appropriate relief ("MAR") in the Cumberland County Superior Court. ((DE 4-2), pp. 2-19). On July 9, 2015, the superior court ordered Condlin to respond to petitioner's allegations that Condlin provided ineffective assistance of counsel. ((DE 4-4), pp. 2-3). Condlin complied by filing an affidavit on July 28, 2015. ((DE 4-5), pp. 2-5). The superior court then denied petitioner's MAR on the record without holding a hearing. ((DE 4-6), p 4). On October 26, 2015, petitioner, through counsel NCPLS, filed a petition for a writ of certiorari in the North Carolina Court of Appeals, which was denied on December 2, 2015. (Resp't's Mem. Ex. 7; (DE 9), Ex. A).

In the interim, petitioner, through counsel NCPLS, filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his petition, petitioner raised the following two claims: (1) the state court misapplied federal law regarding petitioner's claim of ineffective assistance of counsel; and (2) the state court erred by denying petitioner an evidentiary hearing. Respondent subsequently filed a motion for summary judgment, which was fully briefed.

## STATEMENT OF FACTS

The facts as stated by the North Carolina Court of Appeals are summarized as follows:

> This case arises from the death of James "Jimmy" Ali McCullen[1] ("the decedent") and the stabbing of Linda Paige. Around 9:00 p.m.

---

[1] There is some discrepancy regarding the decedent's last name. The State refers to him as Jimmy McCullough, and he is listed as such in the warrant for Defendant's arrest. However, the transcript and Defendant's brief exclusively refer to him as Jimmy McCullen. Relying on the transcript as authoritative, we employ that spelling here.

2

on 14 April 2009, the decedent was seen walking outside the Club Spectrum, near Bragg Boulevard in Fayetteville, dressed in drag. The decedent was working as a prostitute. Later that night, the decedent was found lying in a pool of blood with five stab wounds. A gray shirt and footprints indicating a struggle were discovered nearby. No one at the scene knew the identity of the perpetrator.

A few weeks later, on 8 May 2009, Defendant hired a female prostitute, Linda Paige, to perform oral sex. This occurred behind a vacant house near Mickey's, a nightclub. Once Paige finished, Defendant "snapped" and attacked her, stabbing her several times. While Paige was helpless, Defendant took back his payment and left the scene of the attack. According to Defendant, people then started to chase him, and he ran to Mickey's. There he approached the bouncer, Nathaniel Butler, and claimed that he was being chased by someone who was trying to kill him. Butler put Defendant in a cab and told him to leave. When Butler learned that police were coming, however, he removed Defendant from the cab. Butler then frisked Defendant and found a large knife in his sock.

Paramedics and police arrived at the scene of the stabbing. They discovered Paige on the ground, "hurting and kind of crying [hysterically]," and Officer Alexander Herrera was informed that the perpetrator had gone to Mickey's. Paige was taken to the hospital and released later that night. She did not testify at trial. Herrera proceeded to the nightclub and asked the crowd standing outside "who stabbed the lady across the street." Defendant stood up and responded, "I stabbed her." Defendant was then taken into custody, and one of the bouncers gave the knife to Herrera.

Defendant was questioned on 9 May 2009. During the interrogation, Defendant agreed to speak to the investigators and waived his right to an attorney. Defendant then admitted to murdering the decedent and stabbing Paige. He explained that he had previously solicited a prostitute for oral sex without realizing that the person was biologically male. When he discovered this fact, Defendant became angry and wanted revenge. According to Defendant, the desire for revenge against male prostitutes became so strong that he "went up [Bragg Boulevard] and I got the first one I saw," i.e., the decedent. Defendant admitted that he wanted the decedent to die and stabbed the decedent multiple times "[a]ll over his body[,] all over his body. I wanted to make sure he was dead." Defendant also referenced voices in his head, suicidal thoughts, and the feeling that there were demons inside him trying to escape.

3

> Defendant was charged with assault with a deadly weapon with intent to kill inflicting serious injury and first-degree murder. Those charges were joined for trial.[2] On 7 February 2011, Defendant's attorney filed a motion for a competency evaluation. No further documentation regarding the request for such an evaluation exists in the record on appeal, and Defendant's appellate counsel states that she "was unable to locate either a transcript of a pre-trial hearing regarding [Defendant's] capacity to proceed or a written order by the trial court finding him capable of proceeding to trial."
>
> The trial began on 26 November 2012 in Cumberland County Superior Court. During the trial, a laboratory analyst for the State Bureau of Investigation ("SBI") testified regarding the deoxyribonucleic acid ("DNA") test results from the blood on the decedent's clothes and the gray shirt found at the scene. The blood from the shirt was consistent with the decedent's DNA, and samples obtained from under the armpits and neck were consistent with Defendant's DNA. Additionally, the videotape of the interrogation of Defendant was shown to the jury, and the transcript was admitted into evidence. After the evidence was presented, the jury found Defendant guilty of first-degree murder and assault with a deadly weapon inflicting serious injury.

Oaks, 2014 WL 457769, at *1-2.

Additional facts developed post-conviction as evidenced by the record are as follows. In anticipation of the state seeking the death penalty, Condlin retained the services of Dr. Thomas J. Harbin ("Dr. Harbin") for the purpose of conducting a forensic psychological evaluation of petitioner. ((DE 4-1), Ex. 10). Dr. Harbin then conducted a forensic evaluation of petitioner in March and April of 2010. (Id. Ex. 10, ¶ 3). Dr. Harbin concluded that petitioner "suffers from significant psychopathology" and that "[i]t is likely that [petitioner] was psychotic at the time of the crime." (Id. Ex. 14, p. 149). Dr. Harbin further concluded that "[e]ven if [petitioner] was not floridly psychotic at the time of the crime, the results of [the] evaluation suggested that the defendant

---

[2] The record contains a copy of the motion and order for joinder, but lacks a transcript of the hearing on that motion.

4

was suffering from a mental or physical condition (Schizoaffective Disorder) that was most likely insufficient to constitute an insanity defense but significantly reduced the defendant's culpability for the offense." (Id.) Although Dr. Harbin completed the forensic evaluation of petitioner, Condlin and Dr. Harbin dispute whether Condlin ever requested a copy of Dr. Harbin's report.[3] (Condlin Aff. ¶ 7; (DE 4-1) Ex. 10, ¶ 10). It is undisputed, however, that Condlin did not receive a copy of the report. (Condlin Aff. ¶ 10).

In addition to Dr. Harbin, Condlin employed Vicky L. McGee, LPA ("McGee") to serve as a mitigation specialist, and McGee spent approximately 99 hours working on petitioner's case from June 12, 2009, through January 7, 2011. ((DE 4-1) Ex. 12, ¶ 4). During that time period, Condlin met with McGee twice, and Condlin received periodic telephone updates as well as approximately 51 pages of McGee's interview notes through email. (Id. ¶¶ 5-6). According to McGee's notes, petitioner began using the alias Zeus when petitioner went to clubs so that his friends and family would not know he spent time at clubs. (Id. Ex. 12A, pp. 95-96). Petitioner also told McGee that after petitioner's encounter with a male prostitute, he heard voices telling people about the incident. (Id.) Petitioner further stated that nobody told him to attack McCullen, and that it was not petitioner's intent to kill McCullen. (Id.) Rather, petitioner just wanted the voices to stop. (Id.)

On August 4, 2010, the State provided notice that it no longer intended to seek the death penalty in petitioner's criminal action. (Resp't's Ex. 2, p. 14). As a result, Condlin discontinued the services of both McGee and Dr. Harbin. ((DE 4-1) Ex. 12, ¶ 9; Ex. 13, ¶¶ 11-12; Condlin Aff. ¶ 27). Condlin subsequently filed a motion for a competency evaluation in the superior court citing concerns about petitioner's ability to proceed because petitioner "has spoken of himself in the third

---

[3] The court notes that Dr. Harbin prepared a written report based upon his evaluation of petitioner in response to a request from petitioner's appellate attorney. ((DE 4-1), Ex. 13, ¶ 13).

5

person [and] has an alter ego by the name of Zeus." ((DE 4-1) Ex. 4). The superior court granted the motion for a competency evaluation. (Id.).

Pursuant to the superior court's order, Central Regional Hospital forensic psychiatrist Dr. Nicole Wolfe ("Dr. Wolfe") evaluated petitioner on February 28, 2011. (Id. Ex. 9). Dr. Wolfe noted in her forensic evaluation report that petitioner reported having no suicidal ideation in the past year, and that petitioner's "thought processes were logical and goal directed, with no evidence of psychosis, loose associations, flight of ideas, or delusional thinking." (Id. p. 68). Dr. Wolfe reported that petitioner "started using the nickname of Zeus in high school, and used it when he did not want to tell his real name, such as when he started going to strip clubs." (Id. p. 69). Dr. Wolfe further reported that petitioner graduated from high school as an "honor graduate," had taken classes for academically gifted students, reported a history of alcohol and marijuana use, and had experienced depression. (Id. pp. 69, 73). At the conclusion of her evaluation, Dr. Wolfe determined that petitioner was not "currently suffering from a psychiatric disorder" and was deemed capable to stand trial. (Id. p. 76).

## DISCUSSION

A.  Summary Judgment

    1.  Standard of Review

Summary judgment is appropriate when there exists no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden of initially coming forward and demonstrating an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the

6

nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Industrial Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. Anderson, 477 U.S. at 250.

The standard of review for habeas petitions brought by state inmates, where the claims have been adjudicated on the merits in the state court, is set forth in 28 U.S.C. § 2254(d). That statute states that habeas relief cannot be granted in cases where a state court considered a claim on its merits unless the decision was contrary to or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court, or the state court decision was based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d)(1) and (2). A state court decision is "contrary to" Supreme Court precedent if it either arrives at "a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite" to that of the Supreme Court. Williams v. Taylor, 529 U.S. 362, 406 (2000). A state court decision "involves an unreasonable application" of Supreme Court law "if the state court identifies the correct governing legal principle from [the Supreme] Court's cases but unreasonably applies it to the facts of the state prisoner's case." Id. at 407. A state court decision also may apply Supreme Court law unreasonably if it extends existing Supreme Court precedent to a new context where it does not apply, or unreasonably refuses to extend existing precedent to a new context where it should apply. Id. The applicable statute

> does not require that a state court cite to federal law in order for a
> federal court to determine whether the state court's decision is an
> objectively reasonable one, nor does it require a federal habeas court
> to offer an independent opinion as to whether it believes, based upon

7

its own reading of the controlling Supreme Court precedents, that the [petitioner's] constitutional rights were violated during the state court proceedings.

Bell v. Jarvis, 236 F.3d 149, 160 (4th Cir. 2000), cert. denied, 534 U.S. 830 (2001). Moreover, a determination of a factual issue made by a state court is presumed correct, unless rebutted by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1).

2. Analysis

a. Ineffective Assistance of Counsel

In his first claim, petitioner contends that he received ineffective assistance of trial counsel, attorney Condlin, because Condlin failed to follow-up with the forensic psychologist hired to evaluate petitioner and failed to present a defense of diminished capacity at trial. Petitioner raised his ineffective assistance of counsel claim in his MAR. The superior court denied petitioner's MAR, stating as follows:

> The allegation that the defendant was prejudiced by not having certain witnesses testify in his trial is without merit. The North Carolina Court of Appeals has previously rejected this argument as a ground for asserting ineffective assistance of counsel. See State v. Taylor, 79 N.C. App. 635, 339 S.E.2d 856, *disc. review denied*, 317 N.C. 340, 346 S.E.2d 146 (1986).
>
> Trial counsel's ignorance of a claim, inadvertence, or tactical decision to withhold a claim may not constitute good cause, nor may a claim of ineffective assistance of prior post-conviction counsel constitute good cause. N.C. Gen. Stat. § 15A-1419(c).
>
> Relying on *State v. Aiken*, 73 N.C. App. 487, 326 S.E.2d 919 (1985), the Court of Appeals in *State v. Rhue*, 150 N.C. App. 280 (2002), held that the trial court did not err in denying, without an evidentiary hearing, defendant's motion for appropriate relief alleging ineffective assistance of counsel when the motion failed to supply affidavits or other evidence beyond the bare assertions set forth in defendant's motion.

8

> Ineffective assistance claims are not categorically different from other kinds of claims that can be barred under N.C. Gen. Stat. § 15A-1419. The North Carolina courts are required to examine each claim to determine whether the particular claim at issue could have been brought on direct review. McCarver v. Lee, 221 F.3d 583, 2000 U.S. App. LEXIS 12222 (4th Cir. 2000), *cert. denied*, 531 U.S. 1089, 11 S. Ct. 809, 148 L.E.d2d 694 (2001).
>
> That based upon defense counsel's response (Exhibit A), the court does not find ineffective assistance of counsel.

((DE 4-6) pp. 3-4).

The Sixth Amendment right to counsel includes the right to the effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984). To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must establish a two-prong test. First, a petitioner must show that the counsel's performance was deficient in that it was objectively unreasonable under professional standards prevailing at the time. Id. This court must be "highly deferential" of counsel's performance and must make every effort to "eliminate the distorting effects of hindsight." Id. at 689. Petitioner must overcome "a strong presumption that counsel's representation was within the wide range of reasonable professional assistance" and establish "that counsel made errors so serious that counsel was not functioning as the counsel guaranteed [him] by the Sixth Amendment." Id.; Harrington v. Richter, 562 U.S. 86, 88 (2011); see Gray v. Branker, 529 F.3d 220, 228–29 (4th Cir. 2008). For the second prong, petitioner must show there is a "reasonable probability" that, but for the deficiency, the outcome of the proceeding would have been different. Strickland, 466 U.S. at 694. Even then, however, habeas relief may be granted under Strickland only if the "result of the proceeding was fundamentally unfair or unreliable." Lockhart v. Fretwell, 506 U.S. 364, 369 (1993); Sexton v. French, 163 F.3d 874, 882 (1998).

9

Beginning with the first prong of the Strickland test, the court first addresses petitioner's claim that Condlin's failure to follow-up with the Dr. Harbin, the forensic psychologist hired to evaluate petitioner, was objectively unreasonable. The record reflects that Condlin conducted a detailed pretrial investigation into petitioner's mental health, including obtaining a mental competency evaluation, and an expert to evaluate potential mitigation defenses. In the course of conducting his pretrial investigation, Condlin learned of petitioner's alter ego of "Zeus," observed petitioner reference himself in the third person, learned of petitioner's history of drug and alcohol abuse, and learned that petitioner had a history of hearing voices. ((DE 4-1), Exs. 9, 12; McGee Aff. ¶ 6 and Attach.; Condlin Aff. ¶ 24). Condlin also learned, in the course of his investigation, that petitioner was motivated by revenge when he allegedly attacked and murdered McCullen. (Condlin Aff. ¶¶ 11-16). With this information, Condlin had sufficient information to pursue a diminished capacity defense, but made the strategic choice not to for reasons discussed below. Gray, 529 F.3d at 229 ("'[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'") (quoting Strickland, 446 U.S. at 690–91). Thus, Condlin's failure to obtain Dr. Harbin's report was not unreasonable given his other investigative efforts.

The court now turns to petitioner's contention that if Condlin had obtained a copy of Dr. Harbin's report, Condlin could have presented a diminished capacity defense to petitioner's first-degree murder charge. "The elements of first-degree murder are: (1) the unlawful killing, (2) of another human being, (3) with malice, and (4) with premeditation and deliberation." North Carolina v. McDowell, 215 N.C. App. 184, 715 S.E.2d 602, 609 (2011). First-degree murder is a specific intent crime. North Carolina v. Coble, 351 N.C. 448, 527 S.E.2d 45, 47 (2000). "To show the

10

Case 5:15-hc-02273-FL   Document 31   Filed 01/17/17   Page 10 of 16

specific intent to kill required to prove first-degree murder, the State must show not only an intentional act by the defendant resulting in the death of the victim; the State also must show that the defendant intended for his action to result in the victim's death." North Carolina v. Keel, 333 N.C. 52, 58, 423 S.E.2d 458, 462 (1992) (internal quotation omitted). "Diminished capacity is a means of negating the ability to form the specific intent to kill required for a first-degree murder conviction on the basis of premeditation and deliberation." North Carolina v. Roache, 358 N.C. 243, 595 S.E.2d 381, 408 (2004) (internal quotation omitted). Because diminished capacity negates only the specific intent element of first-degree murder, the defendant still could be found guilty of second-degree murder. North Carolina v. McPherson, No. COA01-552, 2002 WL 1791298, *3 (2002). "Diminished mental capacity may be due to intoxication, disease, or some other cause." North Carolina v. Phillips, 365 N.C. 103, 124, 711 S.E.2d 122, 139 (2011) (1975) (citation omitted).

Regardless of whether Condlin requested Dr. Harbin's report, petitioner cannot demonstrate that Condlin's failure to pursue a diminished capacity defense was objectively unreasonable for several reasons. Most importantly, the record contains ample evidence that petitioner intended to kill McCullen. Specifically, petitioner, in a clear and concise manner, told both Condlin and law enforcement officers that the murder was motivated by revenge for the fact that petitioner previously had an encounter with a prostitute that he subsequently discovered was male. ((DE 4-1), Ex. 8; Condlin Aff. ¶¶ 14-18). In addition to the evidence of intent, the record reflects that petitioner sought to pursue a defense at trial which did not include the admission of guilt. This is evidenced by the fact that petitioner rejected the State's offer to plead guilty to second-degree murder and petitioner's subsequent instruction to Condlin that he "would not put his hand on the Bible and say

11

he killed anyone . . . the jury can find me guilty but I am not saying I did it." ((Tr. p. 28, L. 8). Condlin Aff. ¶ 30).

With the foregoing knowledge, Condlin provided petitioner a defense to the murder charge at trial. (TR p. 99, L. 15-21). In particular, Condlin elicited testimony on cross-examination which suggested deficiencies in the investigation and the potential that someone else murdered McCullen. For instance, when cross-examining Officer Alexander Herrera, Condlin elicited that the initial 911 call described the suspect as shirtless whereas petitioner was wearing a shirt and another person at the scene was shirtless. (Id. pp. 251-253). Condlin also elicited testimony from Sergeant Womble that a "person of interest" also was interviewed during the investigation. (Id. p. 327). Finally, Condlin's cross-examination of Detective Bowman revealed that there were shoe prints around McCullen's body that did not match petitioner's shoes, and suggested that the person who found McCullen's body was the perpetrator. (Id. pp. 479-480).

If Condlin had disregarded petitioner's wishes and pursued a different strategy at trial in the face of petitioner's refusal to admit guilt, it would have presented problems of its own, and potentially resulted in an ineffective assistance of counsel claim. See Campbell v. Polk, 447 F.3d 270, 279-80 (4thCir. 2006) (finding no ineffective assistance of counsel for not pursuing diminished capacity defense where doing so would have conflicted with "petitioner's protestations of his own innocence."); Lovitt v. True, 403 F.3d 171, 181 (4th Cir. 2005) ("[W]e note that Lovitt's attorneys found themselves between a rock and a hard place. Had they ignored Lovitt's advice and interviewed his family members without his consent, then they could be accused of being ineffective for ignoring their client's wishes."); Frye v. Lee, 235 F.3d 897, 906-907 (4th Cir. 2000); Bunch v. Thompson, 949 F.2d 1354, 1364 (4th Cir. 1991) ("The best course for a federal habeas court is to

12

credit plausible strategic judgments in the trial of a state case[.]"); see also, United States v. Arias, 94 F. Supp. 3d. 93, 115 (D. Mass. 2015) (finding no ineffective assistance of counsel for not presenting a diminished capacity defense where the defendant "indicated no willingness to admit that she committed any of the crimes."). Crediting counsel's strategic decisions in this action, petitioner has not demonstrated that Condlin's decision to forgo a diminished mental capacity defense was based upon an inadequate investigation or was unreasonable under the circumstances. See Harrington, 562 U.S. at 106 ("An attorney can avoid activities that appear distractive from more important duties. Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies."). Based upon the foregoing, the MAR court correctly determined that Condlin did not act unreasonably.

Finally, the court turns to the prejudice prong of the Strickland test. If Condlin had successfully pursued a diminished capacity defense, petitioner would have been convicted of second-degree murder. See McPherson, 2002 WL 1791298, at*3. Although Condlin did not pursue a diminished capacity defense, he did obtain a second-degree murder jury instruction at trial and presented a closing argument advocating for second-degree murder in light of the evidence presented. (Tr. pp. 557-558). Specifically, Condlin represented to the superior court judge at trial that he was attempting to "do everything as broad as [he could] to make sure [Condlin] protected all [petitioner's] rights[.]" (TR. p. 529, L 14-16). Condlin also informed the court that "without saying find him guilty of second degree or not first degree, I'm going to kind of hopefully persuade them down that path." (Id. p. 531, L. 11-13). The jury ultimately found petitioner guilty of first-degree murder, despite the second-degree murder instruction and counsel's efforts. Petitioner has not presented evidence sufficient to demonstrate that a diminished capacity defense would have

13

yielded different results, particularly where the record contains ample evidence that petitioner intended to kill McCullen as revenge for his prior experience with a male prostitute. (See ((DE 4-1) pp. 47-49; 53-54; 56-61). Moreover, whether a diminished capacity defense would have been more effective in persuading the jury to convict petitioner of second-degree murder is speculative. As a result, petitioner has not satisfied the prejudice prong of the Strickland test.

Based upon the foregoing, petitioner has not demonstrated that the MAR court's denial of this claim constituted an unreasonable determination of the facts or a decision contrary to or involving an unreasonable application of Supreme Court precedent. Likewise, the state court's ruling was not based on an unreasonable determination of facts, in light of the evidence presented in the state-court proceeding. See 28 U.S.C. § 2254(d)-(e). Therefore, respondent's motion for summary judgment is GRANTED for this claim.

b. Failure of MAR Court to Conduct a Hearing

In his second claim, petitioner argues that the MAR court erred by denying petitioner an evidentiary hearing when petitioner raised questions of fact which, if found in his favor, would entitle him to relief. Errors with state post-conviction proceedings are not cognizable on federal habeas review. See Lawrence v. Branker, 517 F.3d 700, 717 (4th Cir. 2008); Bryant v. Maryland, 848 F.2d 492, 493 (4th Cir. 1988) (holding that errors and irregularities in connection with state post-conviction proceedings are not cognizable on federal habeas review).

Alternatively, the Court "may grant an evidentiary hearing in a § 2254 case only where the petitioner has 'allege[d] additional facts that, if true, would entitle him to relief and has 'establish[ed] one of the six factors set forth in Townsend v. Sain, 372 U.S. 293 (1963).' " Robinson v. Polk, 438 F.3d 350, 368 (4th Cir. 2006) (quoting Fullwood v. Lee, 290 F.3d 663, 681

14

(4th Cir. 2002)). As set forth above, petitioner has failed to allege additional facts that would entitle him to relief. Based upon the foregoing, petitioner's request for an evidentiary hearing is DENIED, and respondent's motion for summary judgment is GRANTED as to this claim.

B.  Certificate of Appealability

Rule 11 of the Rules Governing Section 2254 Cases ("Habeas Rules") provides "the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Having determined petitioner is not entitled to relief and respondent is entitled to dismissal of the petition, the court considers whether petitioner is nonetheless entitled to a certificate of appealability with respect to one or more of the issues presented in his habeas petition.

A certificate of appealability may issue only upon a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Where a petitioner's constitutional claims have been adjudicated and denied on the merits by the district court, the petitioner must demonstrate reasonable jurists could debate whether the issue should have been decided differently or show the issue is adequate to deserve encouragement to proceed further. Miller-El v. Cockrell, 537 U.S. 322, 336-38 (2003); Slack v. McDaniel, 529 U.S. 473, 483-84 (2000).

Where a petitioner's constitutional claims are dismissed on procedural grounds, a certificate of appealability will not issue unless the petitioner can demonstrate both "(1) 'that jurists of reason would find it debatable whether the petition [or motion] states a valid claim of denial of a constitutional right' and (2) 'that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'" Rose v. Lee, 252 F.3d 676, 684 (4th Cir. 2001) (quoting Slack, 529 U.S. at 484). "Each component of the § 2253(c) showing is part of a threshold inquiry, and a court may find that it can dispose of the application in a fair and prompt manner if it proceeds

15

first to resolve the issue whose answer is more apparent from the record and arguments." <u>Slack</u>, 529 U.S. at 484-85.

After reviewing the claims presented in the habeas petition in light of the applicable standard, the court finds reasonable jurists would not find the court's treatment of any of petitioner's claims debatable or wrong and none of the issue are adequate to deserve encouragement to proceed further. Accordingly, a certificate of appealability is denied.

## CONCLUSION

For the foregoing reasons, respondent's motion for summary judgment (DE 17) is GRANTED. The Certificate of Appealability is DENIED. The Clerk of Court is DIRECTED to close this case.

SO ORDERED, this the 17th day of January, 2017.

*[signature]*
LOUISE W. FLANAGAN
United States District Judge